IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

IN RE:                              )
                                    )
     TIMOTHY LIOU,                  )        CASE NO: 12 MP 90002
                                    )
          RESPONDENT.               )        HONORABLE BRUCE W. BLACK

## MEMORANDUM OPINION

Before the court for decision is an Attorney Disciplinary Proceeding brought pursuant to

Local Bankruptcy Rule 9029-4B.[1]  Attorney Timothy K. Liou is charged with violating

applicable disciplinary rules regarding conflicts of interest and candor to this court.  For the

reasons that follow, Mr. Liou will be permanently suspended from practice before the

bankruptcy court for the Northern District of Illinois.

### 1.    Jurisdiction and Authority

This proceeding is brought pursuant to Local Bankruptcy Rule 9029-4B.  After being

approved by the District Court, the rule became effective on January 1, 2012.  It is authorized by,

and promulgated pursuant to, Federal Rule of Civil Procedure 83 and Federal Rule of

Bankruptcy Procedure 9029.  Further authority for this rule is found in section 105(a) of the

Bankruptcy Code[2], and in the inherent authority of a judge of the bankruptcy court to impose

sanctions for misconduct.  *In re Rimsat, Ltd.*, 212 F.3d 1039 (7th Cir. 2000); *In re Volpert*, 110

F.3d 494 (7th Cir. 1997); *In re Evergreen Sec., Ltd.*, 570 F.3d 1257 (11th Cir. 2009); 2 ALAN N.

---

[1] Bankr. N.D. Ill. L.R. 9029-4B(B) (2012) (cited herein as "Local Bankruptcy Rule 9029-4B").
[2] 11 U.S.C. § 101 ff.  Any reference to "section" or "the Code" is a reference to the Bankruptcy Code unless another reference is stated.

RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY § 105.02 [6][b], at 105-34 (16th ed.

2013).

## 2. Background
### a. Procedural History

Pursuant to Local Bankruptcy Rule 9029-4B(B), two judges of this court, Eugene R.

Wedoff and Pamela S. Hollis, filed a complaint with the undersigned chief judge against Mr.

Liou on February 13, 2012. The complaint was considered by the judges of this court who

determined by majority vote that a formal disciplinary proceeding should be commenced. A

Statement of Charges was filed on March 21, 2012, and the proceeding was assigned to the

undersigned judge for hearing. Mr. Liou filed his answer on April 18, 2012. The United States

Trustee accepted the court's appointment to investigate and prosecute the charges. An Amended

Statement of Charges ("ASC") was filed on July 19, 2012, and Mr. Liou's answer was filed on

August 17, 2012.

An evidentiary hearing was conducted, and on January 31, 2013, the court announced its

conclusions that the United States Trustee had proved by clear and convincing evidence[3] that Mr.

Liou had violated the rules of professional conduct as charged in paragraphs 22 through 29 of the

ASC. The court also concluded that the evidence did not prove the allegations in paragraphs 30

and 31.

In April of 2013 an evidentiary hearing was held regarding the appropriate sanctions for

Mr. Liou's conduct. The issues have been thoroughly briefed and argued. This opinion will

address the issues presented in both evidentiary hearings.

---

[3] In an evidentiary hearing on the statement of charges, the prosecuting party need only prove an attorney's
misconduct by a preponderance of the evidence. Bankr. N.D. Ill. R. 9029-4B(B)(11) (2012).

### b. Prior Liou Opinions[4]

Several opinions by members of this court have addressed Mr. Liou and his fee practices.

*In re Jackson*, 401 B.R. 333 (Bankr. N.D. Ill. 2009), followed an evidentiary hearing under

Section 329 of the Bankruptcy Code. The court ordered disgorgement of $17,180.37, the total

fees charged in two cases Mr. Liou filed for the debtor, as a sanction for filing false Rule

2016(b)[5] disclosure statements. *Id.* at 338-39. The court also observed that "[e]ven if the

disclosure statements had been accurate, moreover, disgorgement of most of the fees would be

required because the work Liou performed in the two cases did not remotely justify fees

exceeding $17,000." *Id.* In addition to the inaccurate disclosure statements, the court also faulted

Mr. Liou for filing inaccurate Statements of Financial Affairs ("SOFA") in both cases. *Id.* at

340. Paragraph 9 of each SOFA stated that no payments had been made by the debtor

concerning bankruptcy during the previous year despite the fact that thousands of dollars had

been paid. *Id.* On this issue the court concluded:

> Compounding the problem, in each case Liou had Jackson
> file a SOFA stating that in the year preceding the case Jackson had
> made *no* payments to anyone, including attorneys, for consultation
> concerning relief under bankruptcy laws. Those statements were
> false, of course, because Jackson made the two retainer payments
> to Liou as well as the payment after the dismissal of the first case.
> Liou's explanation—that "we rarely fill out the answer" on the
> SOFA because it duplicates the Rule 2016(b) disclosure

---

[4] The United States Trustee has offered several of these opinions as exhibits. Mr. Liou has objected on relevance grounds and on the basis of Federal Rule of Evidence 404(b). He argues that the court's consideration of the prior opinions is "an attempt to use findings of prior acts or wrongs to show conformity therewith in this instant proceeding." (Pretrial Statement, p. 32). Rule 404(b)(1) provides that "[e]vidence of a . . . wrong . . . is not admissible to prove a person's character in order to show that on a particular occasion this person acted in accordance with the character." The primary issues before the court do not concern how Mr. Liou "acted." They concern his intent and motivation. Rule 404(b)(2) is entitled "Permitted Uses . . . " and provides that "[t]his evidence may be admissible for another purpose, such as proving motive . . . , intent, . . . absence of mistake, or lack of accident." In addition, the prior opinions are clearly relevant to the appropriate sanctions in this proceeding. Thus the objection is not well-taken, and it is overruled. Moreover, because the court can take judicial notice of its own records, the opinions need not be admitted as exhibits. *Griffin v. United States*, 109 F.3d 1217, 1218 n.1 (7th Cir. 1997).

[5] Bankruptcy Rule 2016(b) establishes when a statement for compensation should be filed and provides that disclosure must be made after any payment or agreement not previously disclosed. FED. R. BANKR. P. 2016(b).

> statement—does not wash. The Rule 2016(b) statement is the
> *attorney's* statement; the SOFA is the *debtor's* statement. And
> Jackson did not refrain from answering the SOFA question; he
> answered it and answered it falsely. Jackson's false statements on
> the two SOFAs served only to cloud the compensation picture
> further.

*Id.* (emphasis in the original) (citations and footnotes omitted).

In *In re Nelson*, 424 B.R. 361 (Bankr. N.D. Ill. 2009), the court ordered Mr. Liou to disgorge as

unreasonable $3,290 of $5,290 received from the debtors. The court concluded that the Rule 2016(b)

disclosure statement was unacceptably misleading and that the fee agreement was "so unclear it will be

cancelled pursuant to section 329(b)." *Id.* at 365. The court also touched on Mr. Liou's lack of candor

in responding to the trustee's 329 motion:[6]

> The trustee also alleged in his motion that Mr. Liou's fee
> application was not supported by an itemization of services as
> required by Local Bankruptcy Rule 5082-2. Although this
> allegation was undeniably true, in his written response to the
> motion, Mr. Liou denied it, saying, "Denied. Debtor's counsel has
> attached an itemization for legal services performed to this
> Response (*see* attached itemization)." Neither law nor logic
> allows someone to deny making an error any time they are willing
> to correct it. This denial also supports sanctions against Mr. Liou.

*Id.* at 367.

In *In re Brent*, 458 B.R. 444 (Bankr. N.D. Ill. 2011), the court decided 317 orders to show cause

under Rule 9011(b)[7] in cases consolidated from seven judges. All concerned Mr. Liou's practice of

filing fee applications asserting that he and his clients had entered into the court's Model Retention

Agreement ("MRA")[8] when in fact Mr. Liou had impermissibly modified the agreement. *Id.* at 463.

---

[6] *Cf. In re Hunt*, No. 09B24041, 2009 WL 3571261 (Bankr. N.D. Ill. Oct. 30, 2009) (ordering Mr. Liou to disgorge $2,140 to the debtor, partly as excessive and partly as a sanction for failure to file accurate and timely documents).
[7] Bankruptcy Rule 9011(b) is essentially the equivalent of Federal Rule of Civil Procedure 11. The Rule provides that an attorney or unrepresented party who submits "a petition, pleading, written motion, or other paper" to the court makes four certifications – including the fact that it is not presented for an improper purpose and that the claims have evidentiary support and are supported by existing law. FED. R. BANKR. P. 9011(b).
[8] The judges of this court have for years authorized flat fees for debtors' attorneys in chapter 13 cases conditioned on the attorney and the debtor agreeing to a standard retention contract prescribed by the court. *See Brent*, 458 B.R. at 450-52.

The court ordered Mr. Liou to pay $10,000 to the clerk of the court and to attend and complete

successfully a course in legal ethics at an accredited law school. *Id.* at 464.

Most recently, in *In re Maldonado*, 483 B.R. 326 (Bankr. N.D. Ill. 2012), after a Section

329 hearing, Mr. Liou was ordered to disgorge $2,768.77 in fees to the chapter 13 trustee to be

used to fund the debtor's plan. *Id.* at 328.

### c.  The Charges

Section II of the ASC sets forth the applicable disciplinary rules.  The applicable rules

regarding conflicts of interest and candor to the court are the District Court Local Rules 83.51.7

and 83.53.3 until June 2, 2011[9], when the District Court adopted the Model Rules of Professional

---

[9] Local Rule 83.51.7: Conflict of Interest: General Rule:
    (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to
another client, unless:
        (1) the lawyer reasonably believes the representation will not adversely affect the relationship with
the other client; and
        (2) each client consents after disclosure.
    (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the
lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
        (1) the lawyer reasonably believes the representation will not be adversely affected; and
        (2) the client consents after disclosure.
    (c) When representation of multiple clients in a single matter is undertaken, the disclosure shall include
explanation of the implications of the common representation and the advantages and risks involved.
N.D. Ill. R. 83.51.7 (patterned on the ABA Model Rules).

Local Rule 83.53.3: Conduct Before a Tribunal:
    (a) In appearing in a professional capacity before a tribunal, a lawyer shall not:
        (1) make a statement of material fact or law to a tribunal which the lawyer knows or reasonably
should know is false;
        (2) fail to disclose to a tribunal a material fact known to the lawyer when disclosure is necessary to
avoid assisting a criminal or fraudulent act by the client;
        (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer
to be directly adverse to the position of the client and not disclosed by opposing counsel;
        (4) offer evidence that the lawyer knows to be false, or if the lawyer has offered material evidence
and comes to know of its falsity, the lawyer shall take reasonable remedial measures;
        (5) participate in the creation or preservation of evidence when the lawyer knows or reasonably
should know the evidence is false;
        (6) counsel or assist the client in conduct the lawyer knows to be illegal or fraudulent;
        (7) engage in other illegal conduct or conduct in violation of these rules;
        (8) fail to disclose the identities of the clients represented and of the persons who employed the
lawyer unless such information is privileged or irrelevant;
        (9) intentionally degrade a witness or other person by stating or alluding to personal facts
concerning that person which are not relevant to the case;

Conduct of the American Bar Association ("ABA Model Rules"). After that date, the applicable

rules became ABA Model Rule 1.7[10] regarding conflicts of interest and ABA Model Rule 3.3[11]

regarding candor to the court.

---

(10) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused, but a lawyer may argue, on analysis of evidence, for any position or conclusion with respect to the matter stated herein;

(11) refuse to accede to reasonable requests of opposing counsel that do not prejudice the rights of the client;

(12) fail to use reasonable efforts to restrain and to prevent clients from doing those things that the lawyer ought not to do;

(13) suppress any evidence that the lawyer or client has a legal obligation to reveal or produce;

(14) advise or cause a person to become unavailable as a witness by leaving the jurisdiction or making secret their whereabouts within the jurisdiction; or

(15) pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of the witness' testimony or the outcome of the case, but a lawyer may advance, guarantee, or acquiesce in the payment of expenses reasonably incurred in attending or testifying, and a reasonable fee for the professional services of an expert witness.

(b) The duties stated in section (a) are continuing duties and apply even if compliance requires disclosure of information otherwise protected by LR83.51.6.

(c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.

(d) In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse.

N.D. Ill. R. 83.53.3 (patterned on the ABA Model Rules).

[10] Rule 1.7 Conflict Of Interest: Current Clients:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

MODEL RULES OF PROF'L CONDUCT R. 1.7 (2010).

[11] Rule 3.3 Candor Toward The Tribunal:

(a) A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the

Paragraph 22 of the ASC charges Mr. Liou with violating District Court Local Rule

83.51.7 and ABA Model Rule 1.7 ("Conflict of Interest Rules")

> by failing to disclose a potential conflict to his clients and by
> failing to obtain effective consent from his clients waiving a
> concurrent conflict of interest with respect to outstanding fees from
> his prior representations.  Liou had interests adverse to his clients
> on account of his status as a creditor in the clients' new cases.
> Although debtors may have had defenses to Liou's claim against
> them in these cases, Liou was not in a position to advise the
> debtors that an objection to his claim might have been appropriate.

Paragraph 23 of the ASC charges Mr. Liou with violating the Conflict of Interest Rules

> by failing to disclose a potential conflict to his clients and by
> failing to obtain effective consent from his clients waiving a
> concurrent conflict of interest with respect to his advising them to
> file for Chapter 13, which was in his best interest, when it was in
> the client's best interest to file for Chapter 7.  Liou charged his
> clients larger fees in those cases than he would have been able to
> charge in Chapter 7 cases.  His clients were required to commit a
> substantial portion of their limited monthly income over the course
> of a Chapter 13 plan when they could have obtained the relief they
> sought in Chapter 7 without having to commit so much of their
> monthly income.

Paragraph 24 of the ASC charges Mr. Liou with violating the Conflict of Interest Rules

> by failing to disclose a potential conflict to his clients and by
> failing to obtain effective consent from his clients waiving a
> concurrent conflict of interest with respect to his instructing clients
> to make payments on past due fees when those debts would have
> been subject to discharge.  He did not explain that his interest in

---

lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.
A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal
matter, that the lawyer reasonably believes is false.
(b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to
engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take
reasonable remedial measures, including, if necessary, disclosure to the tribunal.
(c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even
if compliance requires disclosure of information otherwise protected by Rule 1.6.
(d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer
that will enable the tribunal to make an informed decision, whether or not the facts are adverse.
MODEL RULES OF PROF'L CONDUCT R. 3.3 (2010).

collecting on that debt was directly adverse to the client's interest in having the debt discharged.

Paragraph 25 of the ASC charges Mr. Liou with violating the same rules

by failing to disclose a potential conflict to his clients and by failing to obtain effective consent from his clients waiving a concurrent conflict of interest with respect to potentially preferential payments that he accepted from them within 90 days before filing new cases on their behalf. Liou's status as a potential defendant in a preference action gave him an interest that interfered with his obligation as an attorney to give disinterested advice regarding the applicable preference law.

Paragraph 26 of the ACS charges Mr. Liou with violating District Court Local Rule

83.53.3 and ABA Model Rule 3.3 ("Candor Rules")

because he knowingly filed false documents with the bankruptcy court. He provided false answers to question 9 in certain clients' statements of financial affairs, indicating that the clients had made no payment regarding bankruptcy advice within one year prior to the filing of the bankruptcy petition when, in fact, those clients had made such payments. Liou falsely answered this question with the intent to deceive the standing trustee and the court. Because of the misleading answers to question 9, the standing trustee and the court were not put on notice of the possibility of any improper or unethical conduct and therefore were not able to investigate any potential misconduct that Liou had engaged in.

Paragraph 27 of the ASC charges Mr. Liou with violating the Candor Rules "by filing

false statements of financial affairs with the court and failing to correct the false statements in

most cases."

Paragraph 28 of the ASC describes the nominal assignment procedure involving Kurt

Kolar (*See* Stipulated Facts 18-20) as "a subterfuge, designed to conceal from the court the true

holder of the claim." The paragraph charges Mr. Liou with violating the Candor Rules "by filing

with the court knowingly false assignments with the intent to conceal the true recipient of the

proceeds paid on claims to which those assignments related."

Paragraph 29 of the ASC charges Mr. Liou with violating the Candor Rules

> because he knowingly made a false statement of fact to the
> bankruptcy court during an evidentiary hearing. Liou's testimony
> on March 21, 2011 in the Simelton case is unambiguously
> inconsistent with his testimony on April 4, 2011 in that case. Liou
> testified on March 31 that he did not have any agreement with Kurt
> Kolar and that Kolar kept everything that he collected. On April 4,
> he completely contradicted his earlier testimony. At that hearing,
> he testified that he and Kolar did have an agreement and that Kolar
> remitted to Liou all proceeds that Kolar collected. Liou knowingly
> made a false statement to the court on March 31 . . . .

Paragraph 30 of the ASC charges Mr. Liou with violating the Candor Rules

> because he knowingly made a false statement of fact to the
> bankruptcy court regarding his compliance with the Court-
> Approved Retention Agreement. By filing applications for
> compensation with the court representing that he had entered into
> the Court-Approved Retention Agreement, Liou implicitly
> represented that he had performed all of his obligations under the
> agreement. Liou's practice, however, was not to personally meet
> with all of his clients. In the cases where Liou did not personally
> meet with his clients he could not have provided them the advice
> that the Court-Approved Retention Agreement requires him to
> provide. His representations to the court that he had fulfilled all of
> his obligations under the Court-Approved Retention Agreement
> were therefore false . . . .

Paragraph 31 of the ASC charges Mr. Liou with violation of the Candor Rules

> because he knowingly made a false statement of fact to the
> bankruptcy court regarding his failure to disclose his modification
> of the Court-Approved Retention Agreement. The "directives
> page" that Liou required some of his clients to sign modified the
> Court-Approved Retention Agreement that Liou entered into with
> those clients. When a client executed a "directives page," Liou
> could not accurately represent to the court that he had used the
> Court-Approved Retention Agreement. Nevertheless, when Liou
> filed applications for compensation in these cases, he represented
> that to the court that he had used an unmodified Court-Approved
> Retention Agreement. His failure to disclose the use of the
> "directives page" constituted a false statement to the court.

9

### 3.  Evidence
#### a.  Stipulated Facts

Most of the facts are undisputed.  Section II of the Amended Joint Pretrial Statement, filed on

January 10, 2013, contains forty-seven Stipulated Facts.  Many of these facts are taken from the

dockets of bankruptcy cases filed in this district.  Even in the absence of stipulations, the court

can take judicial notice of matters in its own records.  *Griffin v. United States*, 109 F.3d 1217,

1218 n.1 (7th Cir. 1997).

The Stipulated Facts are as follows, quoted verbatim except for material in brackets:

1.      [Mr. Liou] has been licensed to practice law in the State of Illinois since 1995.

2.      [Mr. Liou] began filing bankruptcy cases as an attorney for debtors in 1996, and

his practice became focused in the bankruptcy area in 1997.  [His] bankruptcy practice is focused

exclusively on consumer debtor representation in cases under Chapter 7 and Chapter 13 of the

Bankruptcy Code.

3.      As time passed, [Mr.] Liou came to represent clients who were filing their second,

third, fourth, or fifth bankruptcy petition through his office.  In some of these cases, the debtors

owed [him] outstanding attorney's fees from a prior Chapter 13 case or cases ("Prior Fees") that

had been dismissed before the attorney fees were paid in full.

4.      [Mr.] Liou solicited and accepted payment of Prior Fees from debtor clients

before filing a subsequent case for that client.  [He] solicited and accepted these payments

knowing that the client intended to file a new bankruptcy case, and, in some instances, within 90

days of the new filing.

5.      [Mr.] Liou did not disclose to the clients from whom he accepted payments for

Prior Fees prior to commencing a new case, that his collection of Prior Fees posed, as alleged in

the Amended Statement of Charges, a potential conflict of interest.

6.    [Mr.] Liou did not obtain a written waiver from his clients of the potential conflict of interest posed, as alleged in the [amended] Statement of Charges, by his collection of Prior Fees prior to commencing a new case.

7.    [Mr.] Liou did not obtain an oral waiver from his clients of the potential conflict of interest posed, as alleged in the [amended] Statement of Charges, by his collection of Prior Fees prior to commencing a new case.

8.    On June 26, 2012, the U.S. Trustee served a subpoena upon [Mr.] Liou requesting, *inter alia*, "[c]opies of any and all records evidencing receipt of payments on account of past-due attorney fees."  In response to this request, [Mr.] Liou produced the 69 pages of documents offered as U.S. Trustee Exhibit 49 (the "Past Due Documents").

9.    The Past Due Documents evidence [Mr.] Liou's collection of Prior Fees in the [forty cases listed on Appendix A].

10.    The Past Due Documents do not evidence all instances in which [Mr.] Liou solicited and accepted payment for Prior Fees from a client before filing a new bankruptcy case for that client.

11.    In the [thirty-five cases listed on Appendix B], [Mr.] Liou was owed attorney fees when a debtor's case was dismissed.  [He] thereafter filed a subsequent bankruptcy case for that same debtor, and no outstanding fees for the original case were listed in the Schedules or Statement of Financial Affairs.

12.    In instances where [Mr.] Liou did not collect all Prior Fees in advance of the filing of the subsequent case, he sometimes sought to collect payment through the filing of a proof of claim in that subsequent case.

11

13.     Beginning in 2001, and continuing into 2010, [Mr.] Liou filed proofs of claim for Prior Fees in cases in which he served as debtor's counsel. The proofs of claim stated that Kurt Kolar was the holder of the claim.

14.     The proofs of claim sometimes included an additional amount over and above the principal amount due. The parties disagree as to whether such additional amount was (a) interest or (b) a late charge.

15.     Typically, the aforementioned additional charge was calculated as 9 or 18% of the principal amount owed.

16.     In *In re Ezell*, Case No. 04-41448 the aforementioned additional charge was imposed notwithstanding that Prior Fees had not been awarded by Court Order in the earlier case.

17.     Proofs of claim for Prior Fees were filed in the [thirty-five cases listed on Appendix C].

18.     In some instances, the proofs of claim were accompanied by a document which, on its face, assigned the claim for Prior Fees from [Mr.] Liou to Kurt Kolar for consideration of $10.00.

19.     Kolar paid no consideration to [Mr.] Liou in connection with the assignments referenced in Paragraph 18, above, and never retained any payments with respect to claims for Prior Fees filed under his name. [Mr.] Liou received all payments, to the extent payments were made by the Chapter 13 Trustee, on each of the proofs of claim referenced in Paragraph 17, above.

20.     At first, Kolar endorsed the checks received from the Chapter 13 trustee directly to [Mr.] Liou. Later, after [Mr.] Liou informed Kolar that his bank would no longer accept the

checks endorsed over to him, Kolar deposited the checks into his client funds account and wrote

a check in the same amount to [Mr.] Liou.

21.     [Mr.] Liou did not receive written conflict waivers from any of his clients against

whom he filed a proof of claim.

22.     From the beginning of his practice until early 2009, in general, [Mr.] Liou's

clients' Statements of Financial Affairs response to Question 9 was "none," irrespective of

whether that answer was accurate.

23.     [Mr. Liou] testified at the November 14, 2011 hearing in *In re Simelton* , No. 10-

22771, that before he had clients who were returning to file second cases through his office, [he]

did this because he believed the same information was already disclosed in the 2016(b)

disclosure statement.  [Mr. Liou] further testified that, after he began to receive Prior Fees,

through inattention and by default, the program he used to complete the SOFA, without any

intervention, defaulted to a check-mark in the  "none" box.

24.     [Mr.] Liou continued to file inaccurate Statements of Financial Affairs in some

instances after he was criticized for these inaccuracies in the *In re Joe Jackson*, Case Nos. 07-

18515 and 08-20776, [401 B.R. 333 (Bankr. N.D. Ill. 2009)]

25.     Liou Law Firm is a sole proprietorship. [Mr.] Liou is, and always has been, Liou

Law Firm's proprietor.

26.     The [thirteen] bank accounts [listed on Appendix D] are accounts that are either in

the name of Liou Law Firm or have, at one time or another, received as deposits, funds paid by

clients of Liou Law Firm.

27.     Since 1997, [Mr.] Liou has filed roughly 8,000 bankruptcy cases in the Northern

District of Illinois.

28.    To operate the Liou Law Firm, [Mr.] Liou engaged licensed attorneys.

29.    These attorneys met with [Mr.] Liou's clients, prepared bankruptcy papers on behalf of [Mr.] Liou's clients, and, in some cases, appeared in Court on behalf of [his] clients.

30.    [Mr.] Liou is the only counsel of record in each case filed through his firm. Although a client may meet with an attorney other than [Mr.] Liou, all cases emanating from the Liou Law Firm are filed through [Mr.] Liou's ECF account.

31.    Matthew Baysinger is an attorney licensed to practice law in Illinois. [Mr.] Liou engaged Baysinger to provide legal services to [Mr.] Liou's clients between approximately December of 2011 and July of 2012.

32.    Scott Zale is an attorney licensed to practice law in Illinois. [Mr.] Liou engaged Zale to provide legal services to [Mr.] Liou's clients between approximately February of 2011 and January of 2012.

33.    Roland Schlosser is an attorney licensed to practice law in Illinois. [Mr.] Liou engaged Schlosser to provide legal services to [Mr.] Liou's clients between approximately April 2004 and April 2009.

34.    William Georgakis is an attorney licensed to practice law in Illinois. [Mr.] Liou engaged Georgakis to provide legal services to [Mr.] Liou's clients between approximately March 2009 and July 2010.

35.    Jessica Naples is an attorney licensed to practice law in Illinois. [Mr.] Liou engaged Naples to provide legal services to [Mr.] Liou's clients between approximately March 2011 and October 2011.

36.    Rocio Herrera is an attorney licensed to practice law in Illinois. [Mr.] Liou engaged Herrera to provide legal services to [Mr.] Liou's clients between approximately November 2010 and January 2011.

37.    Brian Deshur is an attorney licensed to practice law in Illinois. [Mr.] Liou engaged Deshur to provide legal services to [Mr.] Liou's clients between approximately June 2008 and October 2008.

38.    David Lugardo is an attorney licensed to practice law in Illinois. [Mr.] Liou engaged Lugardo to provide legal services to [Mr.] Liou's clients between approximately November 2007 and June 2008.

39.    Dipali Patel is an attorney licensed to practice law in Illinois. Dipali Patel was an employee of [Mr.] Liou and/or the Liou Law Firm between 2002 and 2011.

40.    Until 2002, [Mr.] Liou generally made all determinations as to the attorney fee a client would be charged in a particular case. Thereafter, in some instances when [he] was away from the office, Dipali Patel, and then Roland Schlosser were given authority to set fees. In a few Chapter 13 cases in 2012, Matthew Baysinger determined the down payments without [Mr. Liou's] involvement.

41.    From approximately the year 2000 to the present, it has been [Mr.] Liou's general practice to file Chapter 7 cases only when a client was able and willing to pay the entire attorney fee at the outset.

42.    [Mr.] Liou filed Chapter 13 cases for the [forty debtors listed on Appendix E] who were below the applicable median-income, had no property on Schedule A, had no non-exempt property on Schedules B and C, had no secured debts on Schedule D, and had no parking tickets on Schedule F.

43.    At a point prior to October 21, 2009, [Mr.] Liou developed what he refers to as the "Directives Page." These Directives Pages were generally given to clients prior to their bankruptcy filing and instructed them on matters such as when to return to the Liou Law Firm and the amount of payment that needed to be remitted before their case would be filed.

44.    In many Chapter 13 cases in which [Mr.] Liou used the Directives Page, he filed Applications for Compensation with the Court indicating that he had entered into the Court-Approved Retention Agreement with the client(s).

45.    [Mr.] Liou did not disclose the existence of the Directives Pages in his Applications for Compensation and did not file the Directives Pages with the Court.

46.    [Mr.] Liou is the 100% shareholder of FILENOW.COM INC., an entity incorporated under the laws of Illinois on November 29, 2005.

47.    FILENOW.COM owns a website of the same name and serves as assignee of certain claims for Prior Fees owed to [Mr.] Liou that are pursued in state court.

### b. Exhibits

The parties also agreed in the Amended Joint Pretrial Statement to the admissibility of most of the exhibits offered. The United States Trustee's exhibits (USTX) 1 through 27, 29, 32 through 34, 42, 44 through 51, 55, 60, and 61 were all admitted without objection. (There were no USTX's 28, 35 through 41, and 43 when the pretrial statement was prepared.) During the hearing, the objections to USTX's 30, 31, and 56 through 58 were withdrawn. USTX's 62 through 78 were admitted without objection.

Ultimately, Mr. Liou objected only to USTX's 52, 53, 54, and 59. USTX's 52 and 53 were parts of Mr. Liou's federal income tax returns for the years 2008 through 2010. The parties briefed the issue, and the court ultimately sustained the objection. (TX 1311)

16

USTX 54 consists of bank records of FileNow.com, an entity wholly owned by Mr. Liou.
(Stipulated Fact 46)  The relevance objection is overruled, and the exhibit is admitted.  USTX 59
consists of several opinions concerning Mr. Liou's fees.  Mr. Liou's objection was overruled
during the hearing (TX 234) and is the subject of footnote 4 above.  All of Mr. Liou's exhibits
have been admitted.

### c.  Witnesses

The United States Trustee presented seventeen witnesses, including Mr. Liou.  One was
an employee of the United States Trustee's Office.  Another was Mr. Olivadoti, an attorney for
one of the Chapter 13 Standing Trustees.  Ten were former clients of Mr. Liou.  Four were
former employees of Mr. Liou.  The court finds that all of these witnesses, except Mr. Liou, were
credible.

Mr. Liou presented four witnesses in the first phase of the hearing: Mr. Liou himself, an
attorney who does collection work for him, and two clients, Ms. Robin Ross-Aikins and Ms.
Gwendolyn Williams-Pettis.  Of these witnesses, only the collection attorney was credible.

In the second phase of the hearing, the United States Trustee only called Mr. Liou.  Mr.
Liou again testified on his own behalf and presented three character witnesses.

### 4.  Discussion
### a. Conflicts of Interest
### i. Prior Fees

At the outset, it is important to note the fiduciary duties between an attorney and his
client.  A fiduciary relationship exists between an attorney and his client as a matter of law.  *In re
Winthrop*, 219 Ill.2d 526, 302 Ill.Dec. 397, 848 N.E.2d 961, 972 (2006).  An attorney owes his
client fiduciary duties of fidelity, honesty and good faith.  *Doe v. Roe*, 289 Ill. App. 3d 116, 224
Ill.Dec. 325, 681 N.E.2d 640, 645 (1997).  When an attorney places his personal interest above

the interest of the client, the attorney has breached his fiduciary duty. *Id.* It is clear that Mr.

Liou placed his personal interest above the interest of his clients in numerous cases. For

instance, he collected prior fees in subsequent cases – for his own personal gain – without

obtaining the clients' informed consent. As outlined further in the opinion, Mr. Liou suggested

that clients should file chapter 13 cases when chapter 7 would be more appropriate, and many

times received the greatest percentage of the clients' plan payments. As such, Mr. Liou

undoubtedly breached the fiduciary duties owed to his clients.

Turning to the charges set forth in the ASC, the charges in paragraphs 22, 24, and 25 are

factually interrelated. All three relate to Mr. Liou's practice of collecting unpaid fees from

clients for whom he was filing a subsequent case. (Stipulated Facts 3, 4) He used two methods

to collect the prior fees. First, he insisted that any prior fees owing be paid before the new case

would be filed. Second, if the first method failed, he would file a claim for the prior fees in the

new case. (TX 34) The Conflict of Interest Rules prohibit a lawyer from representing a client if

there is a "significant risk" that the representation will be "materially limited" by a personal

interest of the lawyer. Both rules require that the attorney obtain informed consent from the

client in order to continue the representation notwithstanding the conflict.

Although the potential conflict between Mr. Liou's interests as a creditor and the clients'

interests as debtors seems obvious, Mr. Liou has testified that he did not believe there was an

actual conflict of interest created when he pursued the prior fees. (TX 931) He has also testified

that he always discussed the potential conflict with the clients against whom he filed a proof of

claim who then elected to proceed with Mr. Liou representing them. (TX, 57-58, 122, 939) Mr.

Liou's testimony about his conflict discussions with his prior fee clients is not credible for

18

several reasons. First, Mr. Liou has admitted that he had no conflict discussions with prior fee

clients who paid him before he filed their subsequent cases. (Stipulated Facts 5, 6, and 7)

Second, none of the former clients called by the United States Trustee recalled such a

conversation when asked, and none could articulate the potential conflict of interest. (Harlin –

TX 398-399; Wynn – TX 414; Ezell – TX 443, 475; White – TX 488-489; Simon – TX 505;

Cedeno – TX 671)

Third, neither of the two clients called by Mr. Liou on this point – Ms. Robin Ross-

Aikins and Ms. Gwendolyn Williams-Pettis – offered credible testimony to support Mr. Liou's

testimony. Ms. Ross-Aikins's testimony was entirely not credible. She was clearly coached

before testifying. For instance, in the first minute of her testimony, in response to a question

about the outcome of her first case in 2004 with Mr. Liou, she volunteered that she remembered

Mr. Liou talking to her about a conflict of interest. (TX 587) She also purported to remember

the name Kurt Kolar from that conversation (TX 589), but she was unable to articulate the

conflict of interest despite Mr. Liou allegedly explaining it to her repeatedly. (TX 621, 628)

Mr. Liou currently represents Ms. Ross-Aikins in a pending chapter 13 case.

Similarly, at the time Ms. Wiliams-Pettis testified, she was discussing the possibility of

filing another bankruptcy with Mr. Liou. (TX 783) She also recalled talking about conflicts of

interest with Mr. Liou. (TX 774) Her testimony was that, because of the prior fees owed to Mr.

Liou, another attorney would represent her in the new case. (TX 774, 775, 788) She believed

Kurt Kolar was the attorney representing her in the second case. (TX 795) Even assuming Ms.

Williams-Pettis's testimony is true, she did not effectively waive the conflict of interest because

she could not even articulate the proper conflict. Additionally, both Ms. Ross-Aikins and Ms.

Williams-Pettis are biased witnesses since they are current clients of Mr. Liou. Therefore, based on the foregoing reasons, both of their testimony was biased and not credible.

Fourth, the four witnesses who had worked for Mr. Liou clearly contradicted his testimony. Ms. Dipali Patel worked with Mr. Liou from 2002 until April of 2011. (Stipulated Fact 39) She testified that she recalled only one discussion of a conflict of interest, that when a couple filed a joint chapter 13 case while in the process of a divorce. (TX 841) Mr. Scott Zale, who worked for Mr. Liou between approximately February of 2011 and January of 2012 (Stipulated Fact 32), remembered no discussions about conflicts of interest regarding prior fees. (TX 651) Mr. Matthew Baysinger, who worked for Mr. Liou between approximately December of 2011 and July of 2012 (Stipulated Fact 31), testified that they began advising prior fee clients of the potential conflict of interest during the time that he worked for Mr. Liou. (TX 551) Finally, Ms. Sylvia Valdez testified that she worked for Mr. Liou as a paralegal from August of 2010 until October of 2012. She frequently served as an interpreter because none of the attorneys spoke Spanish. She testified that she never translated a conversation about a conflict of interest. (TX 973) These four witnesses were entirely credible, and their testimony clearly establishes the falsity of Mr. Liou's testimony on this issue.

Even if Mr. Liou were telling the truth about discussing conflicts of interest with clients from whom he was collecting prior fees, his version of the conversations would not be sufficient to allow the court to conclude that the clients had given informed consent to the representation. (*See, e.g.,* TX 124) Both Conflict of Interest Rules define the disclosure necessary to obtain the client's consent to the attorney's continued representation despite the potential conflict. District Court Local Rule 83.50.2 (4) states: " 'Disclose' or 'disclosure' denotes communication of

information reasonably sufficient to permit the client to appreciate the significance of the matter

in question." ABA Model Rule 1.0(e) states:

> (e) "Informed consent" denotes the agreement by a person to a
> proposed course of conduct after the lawyer has communicated
> adequate information and explanation about the material risks of
> and reasonably available alternatives to the proposed course of
> conduct.

Mr. Liou testified four times in this proceeding – for each party in both hearings. He had

previously testified before Judges Hollis (USTX 33), Wedoff (USTX 29), and Schmetterer.

(USTX 32) He never once testified that he told a client that his prior fees claim was subject to

discharge in bankruptcy. He never once testified that he told a client that any payments made to

him within 90 days of filing the new case could be set aside as preferences. (Indeed, Mr. Liou

testified that he was unaware of the preference problem until Judge Wedoff explained it to him

in April of 2011. (TX 930, 1404)) Without such specific explanations, the court concludes that

any consent from clients was not informed as required by the Conflict of Interest Rules and was

therefore not effective.

Furthermore, even Mr. Liou's purported current practice of obtaining written waivers of

the prior fee conflict of interest (TX 938) does not produce an effective waiver. What he refers

to as the written waiver is a paragraph in his so-called "Directives Page." (Stipulated Fact 43)

But the paragraph in question is conclusory, stating only "You understand this potential conflict

of interest" (USTX 51, p.4) or "You understand the potential conflict of interest as it has been

more fully explained to you." (*Id.* at 11) An effective waiver is one which comports with the

Conflicts of Interest Rules. This conclusory paragraph does not provide the client with

adequate information or an explanation of the material risks of or alternatives to the waiver.

21

Therefore, these written waivers are not sufficient for informed consent as required by the
Conflict of Interest Rules.

Given Mr. Liou's fee collection practices, the court concludes that there was clearly a
significant risk that Mr. Liou's representation of these debtors would be materially limited by
his personal interests. Mr. Liou could not have reasonably believed otherwise. He was required
to obtain the informed consent of his clients to continue his representation but failed to do so.
Consequently, this charge has been proved.[12]

### ii. Chapter 13 versus Chapter 7

The charge in paragraph 23 of the ASC is that Mr. Liou failed "to disclose a potential
conflict to his clients and by failing to obtain effective consent from his clients waiving a
concurrent conflict of interest with respect to his advising them to file for Chapter 13 . . . ." In
his answer to this charge, Mr. Liou denies that he improperly counseled clients to file chapter 13
cases. He does not state that he made any disclosure to them regarding the potential conflict.
(Answer, pp. 8-9, 26)

The United States Trustee has produced conclusive evidence to support the charges that
Mr. Liou counseled clients to file chapter 13 cases when chapter 7 would have served their
interests better. USTX 3(a) lists forty cases filed by Mr. Liou for debtors who were below the
applicable median income, had no real property on Schedule A, had no non-exempt property on
Schedules B and C, had no secured debts on Schedule D, and had no parking tickets on Schedule
F. (Stipulated Fact 42) Thus, many of the usual reasons for filing under chapter 13 instead of
chapter 7 are not present in those cases. For example, many chapter 13 cases are filed to allow
the debtor to retain a home or a vehicle subject to secured loans in default. Also, debts for

---

[12] One of the Chapter 13 Standing Trustees has taken the position that an attorney cannot represent the debtor and be
a creditor in the same case. (USTX 29(c) p.25, TX 887)  Because the facts here so clearly show that Mr. Liou did
not receive the necessary informed consent of his clients, the court need not address this issue.

unpaid parking tickets are dischargeable in a chapter 13 case but not in a chapter 7 case. *In re Gallagher*, 71 B.R. 138, 139 (Bankr. N.D. Ill. 1987). USTX 3(a) is strong evidence that Mr. Liou filed many cases under chapter 13 rather than chapter 7 to further Mr. Liou's interests in collecting more fees even though chapter 13 was not in the best interests of the debtors.

In most of these cases, there appears to be no valid reason for choosing chapter 13, and Mr. Liou has not even tried to justify the filing. For example, in *In re Williams*, No. 06 B 04978, (TX 81-97) the debtor was a seventy-five year old man suffering from Alzheimer's disease with income of $810 per month and one creditor, the electric utility company to whom he owed $9,030. His electricity had been turned off, so he and his representative contacted Mr. Liou. A case under chapter 7 would have been sufficient to restore power, but Mr. Liou filed a case under chapter 13 because Mr. Williams could not pay Mr. Liou's fees for a chapter 7 case. (USTX 30, p. 4) Mr. Liou's office then contested the Chapter 13 Standing Trustee's motion to convert the case to chapter 7. (USTX 30, p.2)

In *In re Dorothy Radcliff*, No. 08 B 05795, at least one of Mr. Liou's reasons for filing a chapter 13 case was the result of his mistaken belief that tuition debt, like student loan debt, is generally non-dischargeable. (TX 1034) He also testified that the debtor did not want to file another chapter 7 case. (TX 1035) But on cross-examination, he was not certain when he met with her. (TX 1163) This testimony tends to refute Mr. Liou's other testimony that he filed chapter 13 cases based on his clients' wishes.

Ms. Radcliff's case also calls into question Mr. Liou's position that significant student loan debt justifies a chapter 13 filing. Her student loan debt was $6,028 out of a total debt of $9,180. She completed a 53-month plan, paying $80 per month. Of the $4,240 paid into the plan, Mr. Liou received $3,008.47, the entire amount of attorney's fees owed, plus $500 which

he received prior to filing this case. Creditors received less than $1,000. Ms. Radcliff paid $4,740 to discharge $2,230.83 in unsecured debt and was still left with student loan debt of $5,306. (D.E. 27 in 08 B 05795) Mr. Liou could not explain why the plan term was 53 months rather than 60 months, given his position that a chapter 13 in such cases was buying the debtor time. (TX 1167) Mr. Liou appears to have been the only winner here -- receiving 82.7% of the plan payments.

In further support of this charge, the United States Trustee presented testimony from several of the debtors and from Mr. Liou. Mr. Liou was also questioned by his attorney about this issue. His attorney asked whether his firm made more money in a chapter 13 case than in a chapter 7 case. He said, "Total dollar amount, yes, but dollar-per hour wise, more than likely no." (TX 992) He also testified that he would typically let the client decide which chapter to file. (TX 996) Mr. Liou then testified about his office procedures which included explaining the difference between chapter 13 and chapter 7. On direct examination by his attorney, he addressed several specific cases and explained why certain debtors chose chapter 13 over chapter 7, giving the impression that he personally spoke to each debtor. On cross-examination, he could not remember whether he spoke with each debtor or whether he had testified from notes made by others. Ultimately, Mr. Liou's explanation for many of those decisions was simply that the client wanted to file chapter 13. (Joseph Williams – TX 88, 91; Dumas – TX 1021; Gandy – TX 1022; Johnson – TX 1027-28; Negron – TX 1032, Stamps – TX 1035)

Some of Mr. Liou's explanations were at least plausible. (Adams – TX 1013 – food stamp overpayments; Almanza – TX 1018 – student loans; Diggs – TX – 1019 – student loans; Gilmore TX 1024 – student loans; Lynumn – TX 1028 – repossessed car; Holmes – TX 1025 – payday loans; Matthews – TX 1031 – payday loans)

24

Other explanations were not at all plausible. These include the cases cited above in which Mr. Liou testified that the clients wanted to file chapter 13. In addition, Mr. Liou's testimony regarding why Ms. Annie Holmes (TX 1037-44) and Ms. Gloria Porter (TX 1044-48) elected to file under chapter 13 was not credible in light of the credible testimony of those witnesses. (TX 704 ff; 752 ff) Some of Mr. Liou's advice to his clients for selecting chapter 13 instead of chapter 7 appears to be based on his mistaken understanding of the law. (Radcliff – TX 1033, 1163-64 – tuition debt is non-dischargeable; Porter – TX 1046– ineligibility). Another factor that pressed some of Mr. Liou's clients into filing chapter 13 was his office policy requiring attorney fees in chapter 7 cases to be paid before the case was filed. (TX 540)

Mr. Liou's statement that chapter 13 cases are probably not more lucrative than chapter 7 cases is also refuted by the evidence. First, Mr. Liou's chapter 13 clients were often not just charged a single flat fee. They were charged several, one for each case. Most of the former client witnesses were unsure how many cases had been filed for them. (Harlin –TX 392; Ezell – TX 433; White – TX 484, 509; Avila – TX 579, 583-84, Holmes – TX 753-754) Some did not even know why their first case had ended. (Wynn – TX 408-409; White – TX 486; Holmes – TX 758) Second, in many of the cases listed on USTX 3(a), Mr. Liou was far and away the greatest beneficiary of the chapter 13 plan, receiving the largest portion of the plan payments. (Radcliff – 71% – TX 1166; Johnson – 67% – TX 1169; Diggs – 50% – TX 1170; Jimmie Holmes – 93% – TX 1173; Stamps – 47% – TX 1175; Adams – 60% – TX 1177; Gilmore – 94% – TX 1183; Gandy – 71% – TX 1187)

Even in some cases when he may have had a plausible reason for filing a chapter 13 case, Mr. Liou's treatment of these cases is more consistent with generating his fees than in serving the asserted interest of his client. Mr. Liou testified that the main advantage of filing under

25

chapter 13 for a debtor with significant student loans is to buy time. (TX 1162)  That would

suggest that plans should last the maximum time of sixty months, for the maximum benefit of the

debtor.  They often did not – but they did last long enough for Mr. Liou's fees to be paid.

Furthermore, Mr. Liou was not aware of section 523(a)(8) which provides a hardship discharge

specific to student loan debtors. (TX 1160)  That fundamental lack of knowledge suggests he

was more concerned with his own financial interests than with the best interests of his clients.

There are, of course, many legitimate reasons for filing a chapter 13 case.  These include

a desire by the client to pay his or her creditors some portion of the amount owed.  At some

point, however, an attorney has an obligation to counsel a client that chapter 7 is preferable.

Simply explaining differences between the two chapters, and leaving the choice to the clients is

not sufficient to support the attorney's obligation to secure effective consent under the Conflict

of Interest Rules.  The United States Trustee has proved this charge.

### b. Candor to the Court
### i. False Statements of Financial Affairs

Paragraphs 26 and 27 of the ASC charge Mr. Liou with violating the Candor Rules by

filing false documents – SOFAs which indicated that the debtors had received no payments in

the previous year regarding bankruptcy – and failing to correct them.  Mr. Liou does not dispute

what happened. (Stipulated Facts 11, 22-24, and Answer to the ASC, D.E. 22, p.3)  His defense

is that the false filings were not done with the intent to deceive.  (*Id.* at 5-8, TX 1064)  Even

assuming that his defense is true, Mr. Liou had the obligation under the Candor Rules to correct

these false statements.

Judge Goldgar addressed this subject thoroughly in *In re Jackson*, 401 B.R. 333 (Bankr.

N.D. Ill. 2009), and Mr. Liou asserts that he changed his practice after that decision. (TX 1064)

The record shows that his corrective action was less than thorough and that Mr. Liou did not treat

26

the issue with the importance it deserves. (TX 1065-1068; Stipulated Fact 24)  This charge has

been proved.

### ii. The Kolar Claims

Paragraph 29 of the ASC charges Mr. Liou with filing false assignments of his claims for

prior fees with the intent to conceal the true recipient of the proceeds.  Once again, Mr. Liou

does not dispute what he did. (Stipulated Facts 12, 13, 18-21; TX 1106-1122)  He simply asserts

that he did so in good faith. (Answer, pp. 9-13)  He has repeatedly testified that the practice

began when an attorney for one of the Chapter 13 Standing Trustees, Anthony Olivadoti,

objected to Mr. Liou filing the claims in his own name. (USTX 29(c), pp. 39-41; TX 1113) Mr.

Olivadoti has repeatedly testified to the contrary. (USTX 29(c), p. 25; USTX 29(d), p. 29; TX

883-84)  The court believes Mr. Olivadoti and rejects Mr. Liou's testimony.  Mr. Liou

deliberately and in bad faith filed false assignments.  This charge has been proved.

### iii. False Testimony

The next issue is closely connected to the preceding one.  Paragraph 29 of the ASC

charges that Mr. Liou gave false testimony under oath at the March 31, 2011, evidentiary hearing

in *In re Simelton*, No. 10 B 22771, before Judge Wedoff.  The transcript of that hearing was

attached to the ASC and also has been admitted into evidence as USTX 29(b).  The hearing

concerned the reasonableness of Mr. Liou's fees under section 329.

Mr. Liou testified that he had a professional relationship with Attorney Kurt Kolar

whereby Mr. Kolar collected unpaid fees owed to Mr. Liou pursuant to a contingency fee

agreement.  The contingency fee agreement provided that Mr. Kolar would keep twenty-five

percent of what he collected and would remit seventy-five percent to Mr. Liou. (USTX 29(b), pp.

9-11)

27

The questioning moved to Mr. Liou's practice of filing claims for his prior unpaid fees in subsequent cases he filed for the same debtor, sometimes filing the claim in the name of Mr. Kolar. (*See generally* Stipulated Facts 11-20)  The proof of claim in the *Simelton* case had been admitted as an exhibit at the March 31, 2011 hearing and is USTX 1 (ii) herein.  Under questioning by Mr. Jeff Snell, an attorney for the United States Trustee, the following exchange took place:

| | |
|---|---|
| Q. | Now, with the specific claim filed in this case, you testified no money was exchanged, but is there any agreement as to what would happen to the funds that Mr. Kolar would collect? |
| A. | Not, really, no. |
| Q. | Not really? |
| A. | There is no – there is no agreement. |
| Q. | No agreement.  So he gets to keep everything he collects? |
| A. | Yes, he does. |
| Q. | It's a gift? |
| A. | It's not really a gift. |
| THE COURT: | Well, it's a gratuitous transfer. |
| THE WITNESS: | Well, the purpose, remember from that last hearing, was so that I can file this subsequent case for David Simelton and not violate any rules of being a – I'm sorry, I can't think of the – |
| THE COURT: | I think it would be helpful if you would continue your answer.  The conclusion I draw from your transferring the claim for unpaid attorney's fees to Mr. Kolar with no agreement for any compensation or consideration to be received from Mr. Kolar is a transfer that was gratuitous.  It was a gratuitous transfer.  And you were responding to that observation on my part when you lost the train of your thought. If it's not a gratuitous transfer, what is it? That's my question. |
| THE WITNESS: | Yes. |
| THE COURT: | And I would appreciate your answer. |
| THE WITNESS: | I don't know.  If that's what it is, it must be. |

(USTX 29(b), pp. 31-32)

Later in the same hearing, Mr. Kolar testified that he paid all the money received

pursuant to the assigned claims to Mr. Liou. (*Id* .at 43)

The hearing was then continued to the following Monday, April 4, 2011. A transcript of

that hearing is USTX 29(c). At the April 4, 2011, hearing, Attorney Steven M. Shebar appeared

on behalf of Mr. Liou. During that hearing, under questioning by Mr. Shebar, Mr. Liou testified

as follows:

| | |
|---|---|
| Q. | Now, when you assigned the claim for the prior fees to Mr. Kolar, was it ever your intent for Mr. Kolar to actually keep those fees? |
| A. | No. |
| Q. | Did you ever do anything to conceal the fact that you were ultimately going to be the recipient of those funds to anyone? |
| A. | Never. |
| Q. | You did make it clear to Mr. Kolar – I may have asked this already. I'm sorry. You made it clear to Mr. Kolar, I assume, at all times, from the inception at all times, that he was to remit those funds immediately to you; is that correct? |
| A. | Yes, and that was understood, yes. |

(USTX 29(c), p. 52)

On cross examination by Mr. Snell, the following exchange took place:

| | |
|---|---|
| Q. | On Thursday, you testified that you did not receive anything in exchange for the claim and you did not expect anything. When asked, I believe you said that perhaps the consideration was good will. Today your testimony is that you expected to receive payment on the claim throughout. I wonder if you could reconcile that for me. |
| MR. SHEBAR: | Objection. |

| | |
|---|---|
| THE COURT : | It's overruled. |
| THE WITNESS: | I don't think that was my testimony. If it was – |
| THE COURT: | That was most assuredly your testimony, and we had a long conversion about gratuitous transfers that perhaps you can recall. And you asserted in response to my questions that, yes, indeed, it was a gratuitous transfer. |
| THE WITNESS: | Well, I'm sorry. I missed the question. I'm still a little under the weather. I apologize. |
| THE COURT: | Last week when this question came up, you testified that you made the assignments to Mr. Kolar without expecting to receive any payment in connection with the assignment. I asked you if that meant it was essentially a gratuitous transfer to Mr. Kolar. We had a long discussion about that, and you confirmed that, yes, indeed, it was a gratuitous transfer. Mr. Snell is asking you if you can explain the difference between the testimony you gave last week and the testimony that you gave this morning which is diametrically opposite. |
| THE WITNESS: | I believe it's consistent. We talked about Mr. Kolar didn't give me anything. There is a $10 recitation that is in each assignment. He didn't pay that $10. He didn't pay anything. It was – and I said, well, did we call it gratuitous? Did we call it good will? Did we –I didn't know what we called it. I said I probably have to research to see. It's old English. It's custom and practice that one learns in law school. |
| THE COURT: | Okay. So the answer to the question is that when we had the discussion last week, you weren't talking about the amount of the fees that were subject to the assignment, you were talking about the alleged or the stated payment for the assignment? |
| THE WITNESS: | Yes. |

(*Id.* at 74-76)

Mr. Liou defends this charge by asserting that when looking at the complete testimony given on March 31 and April 4 of 2011, it is irrational to conclude that he lied about the assignments of Prior Fees. (Answer, p. 4)  This argument is later expanded to essentially say that Mr. Liou was confused and suffered from "a severe sinus infection" and failed to shift his focus from the "boiler plate ten dollar consideration recital." (*Id.* at 13-15)  Mr. Liou has repeated this defense while testifying in this hearing.  (TX 359-368, 1122-1135)

The court has read and re-read both transcripts, and the court categorically rejects Mr. Liou's argument.  Whether it was "rational" for Mr. Liou to lie to Judge Wedoff or not, this court concludes that he did so intentionally and knowingly.  This charge has been proved.

### iv. Alleged Violations of the Court-Approved Retention Agreement ("CARA")

Paragraph 30 of the ASC charges Mr. Liou with violating the Candor Rules by falsely stating that he had complied with the CARA when in fact he did not personally meet with each debtor as the agreement requires.  Mr. Liou responds that he delegated some of the duties required by the CARA to attorneys on his staff. (Answer, pp. 15, 33)  Mr. Liou is the only attorney in his firm who appears of record in cases filed by the firm. (Stipulated Facts 28-30)  Although the court has reservations about the wisdom of this policy, the court concludes that because he reasonably believed it was proper to delegate duties to his attorney subordinates, he did not *knowingly* make the false statements alleged.  Thus, this charge has not been proved.

Similarly, Paragraph 31 of the ASC charges Mr. Liou with violating the Candor Rules by falsely stating that he had complied with the CARA when in fact he had modified the agreement with a "Directives Page." (Stipulated Facts 43-45)  Mr. Liou responds that, when properly understood, the "Directives Page" does not modify the CARA. (Answer, pp. 15, 33-34)  Again,

31

the court concludes that Mr. Liou's use of the "Directives Page" did not amount to a *knowing*

violation of the CARA. Thus, the charge has not been proved.

### c. Discipline

The United States Trustee has proved the specific charges in Paragraphs 22-29 of the

ASC by clear and convincing evidence. "The purpose of attorney disciplinary proceedings is not

to punish the attorney, but rather protect the public, maintain the integrity of the legal profession,

and protect the administration of justice from reproach." *In re Winthrop*, 219 Ill.2d 526, 302

Ill.Dec. 397, 848 N.E.2d 961, 981 (2006). The court may consider aggravating or mitigating

circumstances prior to imposing discipline. *Id.* The court will now address the aggravating

circumstances in this case.

The United States Trustee has proved that Mr. Liou's policies and practices victimize his

clients in many ways. His clients trust him and return to him for subsequent cases even though

they should not. It is common knowledge among bankruptcy judges that many debtors are only

concerned whether they can afford the monthly payment, without regard to long term

consequences. Bankruptcy judges see this with chapter 13 plans as well as with reaffirmation

agreements that make no economic sense. Mr. Liou exploits this short-sightedness. There is

simply no other explanation as to why Ms. Robin Ross-Aikins returned to Mr. Liou for six cases,

in which he charged her a total of $13,200, or why other clients of Mr. Liou did not complain

about the addition of prior fees to their subsequent cases.

Nearly two years ago in *In re Brent*, Judge Goldgar observed that "Liou's moral compass

badly needs repair." 458 B.R. at 463. Based on the evidence herein, the court questions whether

Mr. Liou has a moral compass. Despite Mr. Liou's testimony about being motivated to help

debtors, the evidence indicates his primary motivation is to collect as much money as possible

from his clients, and he is either unable or unwilling to recognize any ethical or moral restraints. A partial list of his shortcomings follows.

First, the court's conclusion that Mr. Liou intentionally lied to Judge Wedoff while under oath obviously colors all of Mr. Liou's testimony. His testimony is not worthy of belief.

Second, Mr. Liou apparently coached Ms. Ross-Aikins regarding her testimony in this proceeding. Her testimony was not credible, and Mr. Liou admitted talking with her several times before the hearing. (TX 205-209)

Third, Mr. Liou's practice of charging "late fees" or "interest" (Stipulated Facts 14-16) is beyond simple over-reaching. It is totally unsupportable. Not only did Mr. Liou charge either nine or eighteen percent for late payments, he did not wait until the payments were late. (TX 194, 942-45) He also calculated the charges from the date the client signed the fee agreement, even for the period before the case was filed.

Fourth, the court believes that USTX 46(b) provides insight into the true character of Mr. Liou that stands in stark contrast to the opinions expressed by the defense character witnesses. The computer note made by Mr. Liou and furnished in discovery to the United States Trustee says:

> Uncollectible until caselaw changes. We filed a ch. 13, then a ch. 7 that discharged all fees owed to us. This is an ARDC filer. Must sue when caselaw changes! Kept file.

The vindictiveness against a client who filed a complaint with the Attorney Registration and Disciplinary Commission is remarkable.

Fifth, Mr. Liou's reaction to learning about preferences from Judge Wedoff also provides insight. Mr. Liou professed no familiarity with preference law until he testified in the Simelton hearing on April 4, 2011. (USTX 29(c), pp. 81-83) Thereafter, he simply started limiting

collection of prior fees to the amount of $599.99, one cent below the $600 threshold set by

section 547(c)(8). It is hard to believe that an attorney who has practiced bankruptcy law for 17

years just learned about preferences in 2011.

Sixth, two cases Mr. Liou filed for Juana Avilla – 10 B 21375 and 10 B 37399 – illustrate

Mr. Liou's total lack of any moral restraint and the predatory nature of his fee practices. The

first case was filed under chapter 13 on May 11, 2010, in which Mr. Liou received $2,500 of his

$3,500 fee before filing. The Chapter 13 Standing Trustee moved to dismiss the case on June 1,

2010, alleging failure of the debtor to file pay advices as required by section 521(a)(1)(B)(iv).

Federal Rule of Bankruptcy Procedure 1007(c) requires that pay advices be filed with the

petition or within fourteen days thereafter. Mr. Liou did not seek an extension of time, and the

motion to dismiss was granted on July 12, 2010, the first time it was presented. Mr. Liou's fee

application for $3,500 was granted that same day. The debtor made no payments to the trustee.

The case was remarkable only for its short life.

The second case was filed under chapter 7 on August 20, 2010. The Rule 2016(b)

statement Mr. Liou filed with the petition disclosed that he had agreed to a fee of $2,595 for the

case and had received that amount prior to filing the petition. Paragraph 9 of SOFA filed with

the petition listed five payments to Mr. Liou in the year before the chapter 7 petition was filed:

| | | |
|---|---|---|
| $2,500 | on | May 10, 2010 |
| $800 | on | August 2, 2010 |
| $1,000 | on | June 28, 2010 |
| $996 | on | June 28, 2010 |
| $799 | on | August 19, 2010 |

The first payment listed appears to be the pre-petition payment in the first case. The third

payment of $1,000 appears to complete payment on the fees from the first case. The other three

payments total the $2,595 fee for the second case.

34

Two things are remarkable.  First, Mr. Liou received over $6,000 for what probably should have been a simple chapter 7 case from the beginning.  Second, Mr. Liou received $1,996 from the debtor on June 28, 2010, while the first case was still pending.  Mr. Liou could offer no justification or authority for taking money directly from the debtor while the chapter 13 case was pending, and even he admitted that it "looks improper." (TX 118)  That admission came on the first day of this hearing, and Mr. Liou has given no justification for his actions.

Finally, one would expect an attorney facing a disciplinary proceeding like this to be somewhat circumspect regarding his fee practices.  Mr. Liou was not.  In his testimony on the first day of this hearing, he announced that he was sleep-deprived because he had been working until 3:00 a.m. helping a new client file a chapter 13 case.  He repeatedly stated, "I'm exhausted."  This testimony called to mind his defense to the charges of lying to Judge Wedoff.  There he blamed his testimony on confusion and a severe sinus infection.  Consequently, the court looked at the case he filed the night before the hearing and will take judicial notice of its contents.[13]

The case is *In re Kurz*, No. 13 B 01264.  The Rule 2016(b) statement discloses that Mr. Liou received $4,995 from the debtors before filing the case, an extraordinary fee for what the docket reveals to be a fairly typical case.  The statement refers to an attached "Attorney Fee Agreement."  The attachment is entitled "Retainer Agreement."  This agreement modified the CARA by increasing the attorney fees by $1,495 over the court approved flat fee of $3,500 and decreasing the attorney's duties by omitting duties 10 through 16 in the CARA.  Even more remarkable is that paragraph 9 of the SOFA contradicts what is stated in the Rule 2016(b) statement.  Paragraph 9 states that Mr. Liou received $5,256.64, which includes a 5%

---

[13] FED. R. EVID. 201.

35

convenience fee for taking a credit card payment. This case illustrates that Mr. Liou's misconduct is ongoing and appropriate action needs to be taken to protect the public.

In the second phase of the hearing, Mr. Liou presented three character witnesses. All three appear to be exemplary citizens. They testified credibly that, in their opinions, Mr. Liou's character was good. All three based their opinions on their personal experiences with Mr. Liou but did not base their opinions on Mr. Liou's reputation for truthfulness or untruthfulness as permitted by Federal Rule of Evidence 608(a).[14] Even if the court considers these character witnesses, this opinion testimony is far outweighed by the rest of the evidence in this case. Indeed, the court suspects that if these three witnesses viewed all the evidence, their opinions would change.

Mr. Liou's misconduct is persuasive as shown by the evidence before the court. The cases in the appendices speak for themselves. Mr. Liou has been criticized by judges, ordered to disgorge fees, fined $10,000 and ordered to complete a legal ethics class. All to no avail. His lack of candor in this proceeding, his continued predatory fee practices (as seen in the *Kurz* case), and the record as a whole convince the court, by clear and convincing evidence, that the appropriate discipline for Mr. Liou is permanent suspension from practicing before this court.

---

[14] Rule 608. A Witness's Character for Truthfulness or Untruthfulness
(a) Reputation or Opinion Evidence. A witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character. But evidence of truthful character is admissible only after the witness's character for truthfulness has been attacked.
(b) Specific Instances of Conduct. Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
　　　　　(1) the witness; or
　　　　　(2) another witness whose character the witness being cross-examined has testified about.
By testifying on another matter, a witness does not waive any privilege against self-incrimination for testimony that relates only to the witness's character for truthfulness.
FED. R. EVID. 608(a).

## Conclusion

Accordingly, effective on August 30, 2013 at 5:00 p.m., Mr. Liou will be permanently suspended from practice before the bankruptcy court for the Northern District of Illinois. His password for electronic filing will be revoked at that date and time.

The court will also order Mr. Liou to pay restitution to the clients who have been the victims of Mr. Liou's misconduct. Separate orders of permanent suspension and restitution will be entered pursuant to Local Bankruptcy Rule 9029-4B(B)(12).

Judgment for costs is awarded to the United States Trustee based on Illinois Supreme Court Rule 773(b)[15] as outlined in the United States Trustee's itemized list. A separate order for costs will be entered.

Copies of this opinion will be forwarded to the Executive Committee of the United States District Court and to the Illinois Attorney Registration and Disciplinary Commission pursuant to Local Bankruptcy Rule 9029-4B(E).


Dated:   August 8, 2013


Bruce W. Black

Hon. Bruce W. Black
U.S. Bankruptcy Judge

---

[15] Illinois Supreme Court Rule 773(b) allows the court to award costs in connection with an attorney disciplinary proceeding.

## APPENDIX A

| Case Name (In re) | Case Number | Petition Date | Payments disclosed on SOFA Question 9 (* Denotes Amended SOFA) | Prior Fees collected as evidenced by the Past Due Documents |
|---|---|---|---|---|
| Austin | 11-14539 | 4/6/2011 | *$1,401 on 3/8/11 | Prior Fees from 10-20479 ($500 on 11/22/10 and $1,401 on _/8/10)[16] |
| Baldassari | 11-08737 | 3/2/2011 | $1 on 3/16/10; $600 on 3/17/10 | Prior Fees from 10-11631 ($1,890.36 on 3/2/11) |
| Battle | 09-40441 | 10/27/2009 | *$1,441.08 on 10/19/09; $562.92 on 10/19/09 | Prior Fees from 08-31485 ($1,441.08 on 10/9/09) |
| Bibbs | 12-23109 | 6/6/2012 | $318.99 on 5/1/12; $281 on 12/17/11 | Prior fees from 11-14527 ($318.99 on 5/1/12) |
| Blevins | 09-10055 | 3/24/2009 | *576.68 on 3/11/09 | Prior Fees from 07-14151 ($1,553.32 on 3/11/09) |
| Brown | 09-00634 | 1/10/2009 | None | Prior Fees from 08-10654 ($299 on 1/2/09 and $1,500 on 1/9/09) |
| Cedeno | 09-41766 | 11/3/2009 | $130.00 on 10/23/09; $124.00 on 10/27/09; $1,500 on 10/29/09 | Prior Fees from 04-33959 and 05-29434 ($1,500 10/29/09) |
| Edwards | 10-13990 | 3/30/2010 | $1,774.00 on 1/28/10; $605.67 on 3/13/10; $1,314.33 on 3/13/10 | Prior Fees from 08-21767 ($1,500 on 1/28/10; $274 on 1/28/10; $605.67 on 3/13/10) |
| Ezell | 04-41448 | 11/9/2004 | None | Prior Fees from 03-17903 ($200 on 11/1/04) |
| Franco | 11-27884 | 7/6/2011 | $300 on 4/28/11; $1,117.18 on 7/1/11; $704.82 on 7/1/11 | Prior Fees from 10-12547 ($300 on 4/28/11; $1,117.18 on 7/1/11) |
| Godinez | 12-20283 | 5/17/2012 | None | Prior Fees from 11-14603 ($597.34 on 5/12/12) |
| Henderson | 11-08745 | 3/3/2011 | $1,587.00 on 2/19/11 | Prior Fees from 09-02397 ($274 on 12/20/10; $1,713.56 on 1/24/11) |
| Henry, K. | 12-11155 | 3/20/2012 | $275 on 11/7/11; $296.92 on 3/9/12; $.08 on 3/9/12 | Prior Fees from 08-12955 ($296.92 on 3/10/12) |
| Henry, M. | 11-28850 | 7/13/2011 | *729.28 on 6/27/11 | Prior Fees from 09-48503 ($729.28 on 6/27/11) |
| Hines | 12-23108 | 6/6/2012 | *$500.00 on 10/6/11; $499.01 on 5/25/12; $280.00 on 3/6/12; $319.99 on 5/25/12 | Prior Fees from 11-41547 ($280.00 3/6/12)[17] |

| Holiday | 04-44889 | 12/7/2004 | None | Prior Fees from 02-21472 or 03-45837 ($500 on 12/6/04) |
|---|---|---|---|---|
| Holmes | 11-46608 | 11/17/2011 | $599.99 on 11/9/11 | Prior Fees from 10-50204 ($275 on 10/26/11; $324.99 on 11/9/11) |
| Johnson | 09-13924 | 4/20/2009 | None | Prior Fees from 07-19505 ($500 on 4/4/09; $1,829.22 on 4/18/09) |
| Kendricks | 05-28071 | 7/14/2005 | None | Prior Fees from 05-07050 ($500 on 7/8/05) |
| Kye | 12-14644 | 4/10/2012 | $750.00 on 9/2/11; $599.99 on 2/7/12; $1,150.00 on 4/3/12 | Prior Fees from 11-36928 ($287.00 on 1/27/12; $312.99 on 2/7/12) |
| Lawrence | 04-10096 | 3/15/2004 | None | Prior Fees from 03-29298 ($250 on 3/12/04) |
| Lipscomb | 07-04054 | 3/7/2007 | None | Prior Fees from 05-21662 ($638 on 3/6/07) |
| Maldonado | 11-33575 | 8/16/2011 | $933.87 on 8/11/11; $2,768.77 on 8/11/11 | Prior Fees from 10-32258 ($274 on 6/6/11; $659.87 on 8/13/11) |
| Manning-Sanders | 09-44050 | 11/19/2009 | $1,650 on 2/18/09 | Prior Fees from 09-05248 ($795 on 11/19/09) |
| Manuel | 12-08217 | 3/1/2012 | $1,081.01 on 2/9/12 | Prior Fees from 10-40169(?) ($599.99 on 2/9/12) |
| Manuel | 12-25082 | 6/21/2012 | $599.99 on 2/9/12; $100.01 on 2/9/12; $599.99 on 6/20/12 | Prior Fees from 12-08217 ($599.99 on 6/20/12) |
| Martin | 09-41792 | 11/4/2009 | $338.64 on 10/23/09; $109.51 on 10/23/09; $274.00 on 9/10/09; $772.51 on 9/28/09 | Prior Fees from 08-17534 ($772.15 on 9/28/09; $772.15 on 10/9/09; $338.64 on 10/23/09) |
| Moss/Diaz | 12-36611 | 9/14/2012 | $515.00 on 2/10/12; $318.99 on 7/25/12; $.01 on 9/12/12; $281.00 on 7/12/12 | Prior Fees from 12-6505 ($281 on 7/12/12; $318.99 on 7/25/12) |
| Redmond | 12-29684 | 7/26/2012 | $1,400.01 on 7/3/12; $599.99 on 7/3/12 | Prior Fees from 10-53484 ($599.99 on 7/3/12) |
| Ross-Aikens | 12-24899 | 6/20/2012 | $299.99 on 6/1/12; $1,415.00 on 10/25/11; $19.01 on 6/5/12; $300.00 on 5/18/12 | Prior Fees from 11-43491 ($300 on 5/18/12; $299.99 on 6/1/12) |
| Simelton | 10-22771 | 5/18/2010 | None | Prior Fees from 03-13002 ($710 on 5/10/10) |
| Sledd | 12-29682 | 7/26/2012 | $599.99 on 7/20/12; $500.01 on 7/20/12 | Prior Fees from 11-46681 ($281.00 indicated as having been received by note to file made on 7/26/12; $318.99 on 7/20/12) |
| Stuebe | 09-13617 | 4/16/2009 | *$101.20 on 4/16/09; $2,090.20 on "various -- 07 B 19899" | Prior Fees from 07-19899 ($790.42 on 4/16/09) |
| Styles | 07-11911 | 7/3/2007 | None | Prior Fees from 06-11014 ($713.45 on 6/26/07) |

| Sweet | 12-32456 | 8/15/2012 | $993.00 on 11/9/11; $599.99 on 7/19/12; $1,700.01 7/19/12 | Prior Fees from 11-45857 ($599.99 on 7/19/12) |
| Tate | 12-33432 | 8/22/2012 | $599.99 on 8/21/12; $121.02 on 8/21/12 | Prior Fees from 05-26685 ($102 on 8/17/12; $497.99 on 8/21/12) |
| Thompson | 11-12002 | 3/23/2011 | $1,602.11 on 3/18/11 | Prior Fees from 08-02600 ($274 on 3/4/11; $1,328.11 on 3/21/11) |
| Watts | 09-38221 | 10/13/2009 | $274 on 9/25/09 | Prior Fees from 07-15583 ($274 on 9/25/09) |
| Weisinger | 08-23971 | 9/10/2008 | None | Prior Fees from 05-15744 ($274 on 9/8/08; $1,350.09 on 9/9/08 (from sister)) |
| Wise | 08-04390 | 2/26/2008 | *None | Prior Fees from 07-03940 ($1698.18 on 1/8/08) |

## APPENDIX B

| Case Name (In re) | Case No. | Fees owed at dismissal | Date of Dismissal | Subsequent Case No. | Filing Date | Fees for prior case shown in Schedules | Payments disclosed in response to Question 9 of Statement of Financial Affairs (* Denotes Amended SOFA) | Fees collected in advance for subsequent case (*Denotes Amended 2016 Statement) | Case / Payment(s) disclosed in "Past Due Documents" |
|---|---|---|---|---|---|---|---|---|---|
| Avila | 10-21375 | $1,009.64 | 7/12/2010 | 10-37399 | 8/20/2010 | None | $2,500.00 on 5/10/10; $800.00 on 8/2/10; 1,000.00 on 6/28/10; $996.00 on 6/28/10; $799.00 on 8/19/10 | $2,595.00 | No |
| Castro | 07-12260 | $1,160.20 | 10/3/2008 | 08-29117 | 10/28/2008 | None | None | $1,094.91 | No |
| Charles | 08-01373 | $2,264.20 | 8/18/2008 | 09-11953 | 4/3/2009 | None | None | $152.04 | No |
| Delgado | 07-04444 | $734.20 | 10/15/2007 | 07-19270 | 10/18/2007 | None | *None | $1,672.41 | No |
| Echevarria | 08-32941 | $1,665.64 | 11/20/2009 | 10-04079 | 2/2/2010 | None | $1934.00 on 1/29/10 | $0.00 | No |
| Fisher | 08-04365 | $594.20 | 7/17/2008 | 08-22809 | 8/28/2008 | None | None | $3,112.00 | No |
| Furtell | 08-04664 | $456.20 | 7/16/2009 | 09-31260 | 8/25/2009 | None | None | $3,422.75 | No |
| Graham | 07-16965 | $1,383.20 | 7/16/2008 | 08-18807 | 7/22/2008 | None | None | $1,742.90 | No |
| Gutierrez-Ojeda | 08-23329 | $2,067.20 | 3/20/2009 | 09-31307 | 8/25/2009 | None | None | $1,695.00 | No |

| Hilson | 10-32260 | $2,858.64 | 10/29/2010 | 10-55252 | 12/15/2010 | None | $651.00 on 7/19/10; $2,849.00 on 12/6/10; $400.00 on 12/10/10 | $500.00 | No |
|---|---|---|---|---|---|---|---|---|---|
| Humphrey | 07-06935 | $105.00 | 3/25/2008 | 08-12826 | 5/20/2008 | None | None | $2,875.33 | No |
| Jackson | 10-32300 | $941.64 | 12/21/2010 | 11-06106 | 2/16/2011 | None | *$1,246.00 on 2/16/11 | *$1,246.00 | No |
| Jones | 10-10153 | $754.64 | 6/10/2010 | 10-43452 | 9/28/2010 | None | $2,947.00 - No Date | $2,947.00 | No |
| Laboy | 10-24248 | $973.64 | 1/10/2011 | 11-09637 | 3/8/2011 | None | *$1,768.00 on 3/7/11 $471.18 on 3/7/11 | $1,768.00 | No |
| Martin | 07-18053 | $207.21 | 1/3/2008 | 08-08604 | 4/9/2008 | None | None | $0.00 | No |
| Martinez | 08-04968 | $999.69 | 5/13/2008 | 09-48502 | 12/22/2009 | None | $2,637.00 on 12/19/09 | $2,637.00 | No |
| McDougall | 09-05068 | $884.20 | 11/2/2009 | 10-49461 | 11/3/2010 | None | $2,695.00 on 11/1/10 | $2,695.00 | No |
| Moreno | 07-01533 | $1,553.45 | 9/16/2010 | 10-34686 | 8/3/2010 | None | $1.00 on 5/24/10; $500.00 on 6/23/10; $400.00 7/12/10; $500.00 on 7/29/10; $494.00 on 8/2/10 | $1,895.00 | No |
| Nash | 09-07334 | $91.10 | 1/28/2010 | 10-34534 | 8/1/2010 | None | None | $0.00 | No |
| Porter | 07-03400 | $1,195.00 | 10/5/2007 | 07-21659 | 11/17/2007 | None | None | $113.05 | No |
| Robinson | 08-06155 | $619.70 | 7/23/2008 | 08-23841 | 9/9/2008 | None | *None | *$1,206.76 | No |
| Ruiz | 09-01768 | $1,329.20 | 7/16/2009 | 09-38228 | 10/13/2009 | None | $2,180 on 1/22/09 $280.00 on 7/9/09 $2,626.00 on 9/1/09 $900.00 on 9/24/09 | $2,339.71 | No |
| Simmons | 07-08483 | $1,465.20 | 10/25/2007 | 09-28627 | 8/4/2009 | None | $1,340.00 on 8/3/09 | $1,340.00 | No |
| Smith, A. | 09-43804 | $451.02 | 6/23/2010 | 10-33247 | 7/27/2010 | None | *$626.12 on 7/26/10 | *$626.12 | No |
| Smith, C. | 08-15570 | $2,597.68 | 10/3/2008 | 08-34446 | 12/17/2008 | None | None | $1,466.89 | No |
| Smith-Moore | 07-16486 | $1,709.20 | 8/18/2008 | 08-29106 | 10/28/2008 | None | None | $624.15 | No |
| Stuckey | 08-05790 | $435.00 | 9/11/2008 | 08-32320 | 11/25/2008 | None | None | $3,500.00 | No |
| Surpris | 07-11540 | $1,441.20 | 8/18/2008 | 08-25314 | 9/23/2008 | None | None | $1,054.25 | No |
| Taylor | 09-38226 | $8.49 | 12/16/2009 | 10-08783 | 3/2/2010 | None | $3,500.00 on 3/1/10 | $3,500.00 | No |
| Tucker | 08-26821 | $1,824.52 | 9/16/2009 | 09-41789 | 11/4/2009 | None | $1,933.10 on 11/2/09 | $0.00 | No |

| West | 07-18532 | $527.00 | 10/8/2008 | 08-31481 | 11/18/2008 | None | None | $253.96 | No |
|------|----------|---------|-----------|----------|------------|------|------|---------|-----|
| Williams | 07-08442 | $927.68 | 1/9/2008 | 09-15323 | 4/28/2009 | Kurt Kolar $1,053.32 | None | $0.00 | No |
| Williams | 08-12171 | $1,690.17 | 12/8/2009 | 09-49093 | 12/29/2009 | Kurt Kolar $475.24 | $1,506.00 on 12/19/09;  $254.00 on 11/30/09; $500.00 on 12/26/09 | $0.00 | No |
| Winston | 10-05057 | $1,195.28 | 1/3/2011 | 11-09608 | 3/8/2011 | None | $1.72 on 2/3/10 | $1.72 | No |
| Wright | 08-01390 | $1,544.00 | 2/7/2008 | 08-04355 | 2/26/2008 | None | None | $1,956.00 | No |

**APPENDIX C**

| Case Name (In re) | Case Number | Claim # on Claims Register | Date Claim Filed | Amount of Claim |
|---|---|---|---|---|
| Sappington | 01-00908 | 1 | April 20, 2001 | $537.61 |
| Simon | 01-08098 | 1 | April 20, 2001 | $1,518.62 |
| Ewing | 01-34586 | 7 | February 6, 2002 | $3,301.85 |
| Joseph | 02-30583 | 4 | May 6, 2004 | $1,723.71 |
| Tripp | 02-32496 | 5 | November 25, 2002 | $937.74 |
| Norman | 03-27855 | 1 | July 24, 2003 | $2,749.40 |
| Childs | 03-38719 | 1 | September 29, 2003 | $2,200.00 |
| Wynn | 03-40852 | 6 | January 13, 2004 | $2,322.00 |
| Bolden | 03-48814 | 1 | December 10, 2003 | $1,509.15 |
| Payne | 04-03297 | 1 | February 9, 2004 | $1,137.14 |
| Lawrence | 04-10096 | 2 | April 13, 2004 | $1,936.00 |
| Hayes-Mathis | 04-11545 | 2 | April 13, 2004 | $1,105.00 |
| Evans | 04-13374 | 1 | April 13, 2004 | $2,016.00 |
| Ferguson | 04-21870 | 3 | August 9, 2004 | $1,589.65 |
| Conner | 04-33930 | 5 | November 1, 2004 | $2,227.43 |
| Spano | 04-34921 | 2 | October 27, 2004 | $1,437.45 |
| Vogwill | 04-37199 | 5 | October 27, 2004 | $450.00 |
| Miulli | 04-37728 | 1 | October 21, 2004 | $3,274.47 |
| Ezell | 04-41448 | 5 | May 24, 2006 | $2,625.26 |
| Aikens | 04-43401 | 1 | December 6, 2004 | $544.00 |
| Sowell | 04-44662 | 1 | December 16, 2004 | $591.18 |
| Harlin | 04-45219 | 1 | December 14, 2004 | $1,100.85 |
| Pettis | 05-00847 | 3 | February 7, 2005 | $3,186.00 |
| Lipscomb | 05-21662 | 4 | June 22, 2005 | $1,916.75 |
| Cedeno | 05-29434 | 4 | November 5, 2005 | $2,421.24 |
| White | 05-33455 | 1 | October 5, 2005 | $1,800.54 |
| Riley | 05-43883 | 3 | February 22, 2006 | $1,294.94 |
| Bolden | 07-00788 | 10 | June 12, 2007 | $462.23 |
| Quevedo | 07-14146 | 4 | November 27, 2007 | $945.52 |
| Johnson | 08-03585 | 6 | March 2, 2008 | $1,317.84 |
| Trotter | 08-21740 | 3 | November 20, 2008 | $1,863.60 |
| Brown | 09-02380 | 19 | May 26, 2009 | $3,123.66 |
| Williams | 09-15323 | 4 | June 7, 2009 | $1,056.97 |
| Cedeno | 09-41766 | 6 | December 8, 2010 | $5,707.87 |
| Simelton | 10-22771 | 12 | September 10, 2010 | $2,634.97 |

**APPENDIX D**

| Institution | Account Number (last four) | Name on Account | Known Activity Period |
|---|---|---|---|
| Bank of America | 8122 | LIOU LAW FIRM TIMOTHY LIOU, SOLE PROP CONSTRUCTION ACCOUNT | 07/2010-09/2012 |
| | 1836 | DBA LIOU LAW FIRM TIMOTHY LIOU SOLE PROP | 05/2010-09/2012 |
| | | | |
| BMO Harris, N.A. | 8674 | LIOU LAW FIRM P.C. | 10/2005-07/2012 |
| | 2948 | LIOU LAW FIRM P.C. | 12/2008-07/2012 |
| | | | |
| Charter One | 9133 | Liou Law Firm/T K Liou | 10/2005-11/2007 |
| | 5055 | Liou Law Firm/T K Liou | 10/2005-12/2007 |
| | 7122 | Liou Law Firm | 11/2007-06/2008 |
| | 7130 | Liou Law Firm | 11/2007-06/2008 |
| | 7149 | Liou Law Firm | 12/2007-06/2008 |
| | | | |
| JP Morgan Chase | 0613 | Timothy K Liou Esq | 06/2011-03/2012 |
| | 1252 | Timothy K Liou | 04/2007-03/2012 |
| | 4346 | Timothy K Liou | 06/2005-04/2012 |
| | 0324 | Filenow Com Inc | 05/2011-03/2012 |

**APPENDIX E**

| Case Name (In re) | Case Number |
|---|---|
| Hayes | 06-01582 |
| Williams | 06-04978 |
| Miranda | 06-09615 |
| Del Rosario | 06-11376 |
| Abdullahi | 06-11767 |
| Bautista | 06-16416 |
| Howard | 06-16821 |
| Moncure | 07-00120 |
| Richard | 07-03405 |
| Radcliff | 08-05795 |
| Williams | 08-12163 |
| Ward | 08-17658 |
| Santiago | 09-00636 |
| Johnson | 09-00638 |
| Wilson | 09-01552 |
| Diggs | 09-01845 |
| Holmes | 09-03443 |
| Stamps | 09-03451 |
| Sheran | 09-05043 |
| Adams | 09-05061 |
| Dumas | 09-05075 |
| Lynumn | 09-07347 |
| Gilmore | 09-08019 |
| Scott | 09-21865 |
| Almanza | 09-27843 |
| Negron | 09-28632 |
| Johnson | 09-36919 |
| Zielske | 09-43621 |
| Chappell | 09-46345 |
| Kenney | 10-00986 |
| Morales | 10-12548 |
| Porter | 10-21376 |
| Owens | 10-26807 |
| Johnson | 10-29108 |
| Cliff | 10-30256 |
| Hernandez | 10-44748 |
| Holmes | 10-50204 |
| Matthews | 11-21172 |

| Holmes | 11-46608 |
|--------|----------|
| Gandy  | 12-01031 |